**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PROTECTMARRIAGE.COM - YES ON 8, A PROJECT OF CALIFORNIA RENEWAL; NATIONAL ORGANIZATION FOR MARRIAGE CALIFORNIA, Yes on 8, Sponsored by National Organization for Marriage; NATIONAL ORGANIZATION FOR MARRIAGE CALIFORNIA PAC; JOHN DOE #1, an individual,
*Plaintiffs-Appellants*,

v.

DEBRA BOWEN; ROSS JOHNSON; CALIFORNIA SECRETARY OF STATE; KAMALA HARRIS, in her official capacity as Attorney General of the State of California; EUGENE HUGUENIN, JR.; LYNN MONTGOMERY; RONALD ROTUNDA; ANN MILLER RAVEL, in her official capacity as Chair of the Fair Political Practices Commission; SEAN ESKOVITZ, in his official capacity as Commissioner of the Fair Political Practices Commission; DEPARTMENT OF ELECTIONS CITY AND COUNTY OF SAN FRANCISCO; DENNIS J. HERRERA, City Attorney

No. 11-17884

D.C. No. 2:09-cv-00058-MCE-DAD

OPINION

for the City and County of San Francisco; DEAN C. LOGAN; JAN SCULLY,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Eastern District of California
Morrison C. England, Jr., Chief District Judge, Presiding

Argued and Submitted
October 11, 2013—San Francisco, California

Filed May 20, 2014

Before: J. Clifford Wallace, Milan D. Smith, Jr.
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Dissent by Judge Wallace

# SUMMARY[*]

## Civil Rights

The panel affirmed in part the district court's summary judgment and dismissed in part the appeal as non-justiciable in an action challenging California's Political Reform Act of 1974, which requires political committees to report certain information about their contributors to the State, specifically, semi-annual disclosures identifying those individuals who have contributed more than $100 during or after a campaign, in addition to each contributor's address, occupation and employer.

Appellants are political committees that supported the November 2008 passage of Proposition 8, which before it was invalidated, amended the California Constitution to provide that only marriage between a man and a woman is valid or recognized in California. Arguing that their donors have been harassed as a result of Political Reform Act disclosures, appellants asserted that the Act's $100 reporting threshold and post-election reporting requirements were facially unconstitutional in the context of ballot initiatives.

The panel held that *Family PAC v. McKenna,* 685 F.3d 800, 809–11 (9th Cir. 2012), directly precluded appellants' challenge to the $100 threshold. The panel further held that the government's interest in disclosing contributions to ballot initiative committees was not merely a pre-election interest. The panel therefore affirmed the district court's judgment

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

with regard to appellants' facial challenges to the post-election reporting requirements.

The panel dismissed the appeal as non-justiciable with regard to appellants' as-applied challenges. The panel held that to the extent that appellants sought an injunction requiring the State to purge records of their past disclosures, any claim for such relief was moot given that the information has been publicly available on the Internet and in hard copy for nearly five years. To the extent that appellants sought a forward-looking exemption from the Political Reform Act's requirements, the panel held such claim was not ripe. The panel remanded with instructions that the district court vacate the portion of its opinion concerning appellants' as-applied challenges.

Dissenting in part, Judge Wallace disagreed with the majority's determination that appellants' as-applied challenges were non-justiciable.

## COUNSEL

John C. Eastman (argued), Center for Constitutional Jurisprudence, Orange, California; James Bopp, Jr. (argued) and Richard E. Coleson, The Bopp Law Firm, Terre Haute, Indiana; Benjamin W. Bull, Alliance Defense Fund, Scottsdale, Arizona; David J. Hacker, Alliance Defense Fund, Folsom, California; Noel H. Johnson and Kaylan L. Phillips, ActRight Legal Foundation, Plainfield, Indiana, for Plaintiffs-Appellants.

Mollie M. Lee (argued), Dennis J. Herrera, Therese M. Stewart, and Jon Givner, Office of the City Attorney, San

Francisco, California; Zackery P. Morazzini (argued) and Jack Woodside, Fair Political Practices Commission, Sacramento, California; Kamala D. Harris, Tamar Pachter, and Daniel J. Powell, Office of the Attorney General, San Francisco, California; Terence J. Cassidy and Kristina M. Hall, Porter Scott, Sacramento California, for Defendants-Appellees.

Trevor Potter, J. Gerald Hebert, Paul S. Ryan, and Megan McAllen, The Campaign Legal Center, Washington, D.C., for Amicus Curiae The Campaign Legal Center.

**OPINION**

M. SMITH, Circuit Judge:

Appellants bring facial and as-applied challenges to California's Political Reform Act of 1974, Cal. Gov. Code. §§ 81000–91014 (PRA), and seek (1) an injunction exempting them from the PRA's future reporting deadlines, and (2) declaratory and injunctive relief requiring the State to purge all records of Appellants' past PRA disclosures. The district court granted summary judgment in favor of the State of California on all counts. We affirm the district court's judgment with regard to Appellants' facial challenges. We dismiss this appeal as non-justiciable with regard to Appellants' as-applied challenges. And, we remand with instructions that the district court vacate the portion of its opinion concerning Appellants' as-applied challenges.

**FACTUAL AND PROCEDURAL BACKGROUND**

The PRA requires political committees to report certain information about their contributors to the State. Specifically, political committees must file semi-annual disclosures, which, among other things, identify those individuals who have contributed more than $100 during or after a campaign, in addition to each contributor's address, occupation, and employer. Cal. Gov. Code §§ 84200, 84211(f). The State of California then publishes this information on the website of the California Secretary of State (the Secretary), and produces hard copies upon request.

Appellants, to whom we refer as the Prop 8 Committees or the Committees, are political committees that supported the November 2008 passage of Proposition 8. That

proposition amended the California Constitution to provide that "[o]nly marriage between a man and a woman is valid or recognized in California." Cal. Const., Art. I, § 7.5. Proposition 8 was subsequently invalidated. *See Hollingsworth v. Perry*, 133 S. Ct. 2652, 2660 (2013) (citing *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 1004 (N.D. Cal. 2010)).

Prior to Proposition 8's passage, the Prop 8 Committees submitted disclosures to comply with the PRA's semi-annual reporting deadlines. These disclosures were published on the Secretary's website, and are available in hard copy. Following Proposition 8's passage, the Committees initiated this action in the United States District Court for the Eastern District of California, challenging the constitutionality of the PRA's disclosure requirements both facially and as applied to them. The Committees argued that their donors have been harassed as a result of the Committees' PRA disclosures, and they sought (1) an injunction exempting them from the PRA's future reporting deadlines, and (2) declaratory and injunctive relief requiring the State to purge all records of their past PRA disclosures.

On January 30, 2009, the district court denied Appellants' motion for a preliminary injunction. Appellants did not appeal the district court's order under 28 U.S.C. § 1292(a). Instead, they complied with the PRA's January 31, 2009 disclosure deadline, reporting those contributors who donated after October 19, 2008 and before December 31, 2008. The Secretary published these disclosures on her website, and made them publicly available in hard copy.[1] On November 4,

---

[1] Appellant "National Organization for Marriage California PAC" was subsequently formed, and joined in Plaintiffs' Third Amended Complaint.

2011, the district court granted summary judgment in favor of the State on all counts. Appellants timely appealed, asking us to reverse the judgment of the district court and to order the State to purge all records of Appellants' PRA disclosures.

We have jurisdiction under 28 U.S.C. § 1291. We review a district court's grant of summary judgment de novo. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007). We review questions of justiciability de novo. *Bell v. City of Boise*, 709 F.3d 890, 896 (9th Cir. 2013).

## DISCUSSION

### I.  Facial Challenges

Appellants assert that the PRA's $100 reporting threshold and "post-election reporting requirements" are facially unconstitutional in the context of ballot initiatives. Our decision in *Family PAC v. McKenna* directly precludes Appellants' challenge to the $100 threshold. 685 F.3d 800, 809–11 (9th Cir. 2012) (holding that $25 and $100 contribution disclosure thresholds survive "exacting scrutiny" in the context of ballot initiatives). Appellants' facial challenge to the post-election reporting requirements fails as well.

### A.  Legal Standard

Contribution disclosure requirements are subject to "exacting scrutiny." *Citizens United v. FEC*, 558 U.S. 310, 366–67 (2010); *Buckley v. Valeo*, 424 U.S. 1, 44 (1976). In applying exacting scrutiny, we first ask whether the challenged regulation burdens First Amendment rights. If it does, we then assess whether there is a "substantial relation"

between the burden imposed by the regulation and a "sufficiently important" governmental interest. *Citizens United*, 558 U.S. at 366–67; *Family PAC*, 685 F.3d at 805–06 (citing *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1005 (9th Cir. 2010)).

Although disclosure is generally "a less restrictive alternative to more comprehensive regulations of speech," *Citizens United*, 558 U.S. at 369, contribution disclosure requirements may burden First Amendment rights by, among other things, deterring "individuals who would prefer to remain anonymous from contributing," *Family PAC*, 685 F.3d at 806–07 (internal quotation marks omitted). To justify these burdens and to survive exacting scrutiny, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Doe No. 1 v. Reed*, 561 U.S. 186, 130 S. Ct. 2811, 2818 (2010) (internal quotation marks omitted).

The Supreme Court recognizes three substantial government interests that campaign contribution disclosure requirements may serve. *Buckley*, 424 U.S. at 66–68; *see also Doe*, 130 S. Ct. at 2819–21. First, disclosure requirements may serve a substantial "informational interest" by providing the electorate with information about the source of campaign money, the individuals and interests seeking their vote, and where a particular ballot measure or candidate falls on the political spectrum. *Buckley*, 424 U.S. at 66–67; *Family PAC*, 685 F.3d at 806. This interest is particularly important in the ballot initiative context. As we explained in *Family PAC*:

> The governmental interest in informing the electorate about who is financing ballot measure committees is of great importance.

> Disclosure enables the electorate to give
> proper weight to different speakers and
> messages . . . by providing the voting public
> with the information with which to assess the
> various messages vying for their attention in
> the marketplace of ideas . . . . Given the
> complexity of the issues and the unwillingness
> of much of the electorate to independently
> study the propriety of individual ballot
> measures, we think being able to evaluate who
> is doing the talking is of great importance
> . . . . Disclosure also gives voters insight into
> the actual policy ramifications of a ballot
> measure. Knowing which interested parties
> back or oppose a ballot measure is critical,
> especially when one considers that ballot-
> measure language is typically confusing, and
> the long-term policy ramifications of the
> ballot measure are often unknown.

*Family PAC*, 685 F.3d at 808–09 (internal quotation marks and citations omitted); *see also Human Life of Wash. Inc.*, 624 F.3d at 1006 ("[T]he high stakes of the ballot context only amplify the crucial need to inform the electorate . . . .").

Disclosure requirements may also help preserve the integrity of the electoral process by deterring corruption and the appearance of corruption. *Doe*, 130 S. Ct. at 2819; *Buckley*, 424 U.S. at 67 (explaining that disclosure requirements deter "those who would use money for improper purposes either before or after the election"). This interest extends generally to "promoting transparency and accountability in the electoral process," and those states that allow ballot initiatives "have considerable leeway to protect

the integrity and reliability of the initiative process." *Doe*, 130 S. Ct. at 2819 (citations and quotations omitted).

Finally, disclosure requirements may permit accurate record-keeping. "[D]isclosure requirements are an essential means of gathering the data necessary to detect violations of . . . contribution limitations." *Buckley*, 424 U.S. at 68. Such records further enhance the public's future associational rights by offering voters information about which policies those seeking their vote have previously endorsed.

Both the Supreme Court and our court have rejected facial challenges to contribution disclosure requirements in several cases, holding that these substantial interests outweigh the modest burdens that the challenged disclosures impose on First Amendment rights. *See, e.g.*, *Doe*, 130 S. Ct. at 2820 (holding that a state law authorizing private parties to obtain copies of referendum petitions is "substantially related to the important interest of preserving the integrity of the electoral process"); *Family PAC*, 685 F.3d at 805–11; *Human Life of Wash. Inc.*, 624 F.3d at 1013–14; *Alaska Right To Life Comm. v. Miles*, 441 F.3d 773, 791–92 (9th Cir. 2006).

### B. Application

The PRA imposes reporting requirements on ballot committees, which require them to disclose the names of, and other identifying information about, contributors who donate $100 or more. The PRA's reporting deadlines are semi-annual. Accordingly, donations that are made prior to an election, but after the final pre-election reporting deadline, are reported after the election concludes. Appellants argue that this requirement is unconstitutional, because a state's only interest in disclosure is its interest in an informed

electorate, and this interest allegedly expires with the election's conclusion. We reject Appellants' narrow view of the government's interest in disclosure.

A state's interests in contribution disclosure do not necessarily end on election day. Even if a state's interest in disseminating accurate information to voters is lessened after the election takes place, the state retains its interests in accurate record-keeping, deterring fraud, and enforcing contribution limits. As a practical matter, some lag time between an election and disclosure of contributions that immediately precede that election is necessary for the state to protect these interests. In this case, for example, Appellants' contributions surged nearly 40% (i.e., by over $12 million) between the final pre-election reporting deadline and election day. Absent post-election reporting requirements, California could not account for such late-in-the-day donations. And, without such reporting requirements, donors could undermine the State's interests in disclosure by donating only once the final pre-election reporting deadline has passed. Accordingly, we hold that the government's interest in disclosing contributions to ballot initiative committees is not merely a pre-election interest, and we affirm the district court's judgment with regard to Appellants' facial challenges.

## II. As-Applied Challenges

Appellants also challenge the PRA disclosure requirements as applied to themselves.

To the extent that Appellants seek an injunction requiring the State to purge records of their past PRA disclosures, any claim for such relief is moot. To the extent that Appellants seek a forward-looking exemption from California's PRA

requirements, such a claim is not ripe. Accordingly, we dismiss as non-justiciable Appellants' appeal from the district court's judgment rejecting their as-applied claims, and we direct the court to vacate this portion of its opinion.

## A. Mootness

Article III's "case-or-controversy" requirement precludes federal courts from deciding "questions that cannot affect the rights of litigants in the case before them." *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974) (per curiam) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)).

### 1. Present Controversy

#### a. Legal Standard

It is not enough that a case presents a live controversy when it is filed. *FEC v. Wisc. Right To Life, Inc.*, 551 U.S. 449, 461 (2007). An actual controversy must exist at all stages of federal court proceedings. *Spencer v. Kemna*, 523 U.S. 1, 7 (1998). This means that, at all stages of the litigation, the plaintiff "must have suffered, or be threatened with, an actual injury traceable to the defendant [that is] likely to be redressed by a favorable judicial decision." *Id*. (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)). "[T]he judicial branch loses its power to render a decision on the merits of [a] claim," *Nome Eskimo Cmty. v. Babbitt*, 67 F.3d 813, 815 (9th Cir. 1995), when a federal court can no longer effectively remedy a "present controversy" between the parties, *Doe*, 697 F.3d at 1238 (quoting *Feldman v. Bomar*, 518 F.3d 637, 642 (9th Cir. 2008)).

We are unable to effectively remedy a present controversy between the parties where a plaintiff seeks to enjoin an activity that has already occurred, and we cannot "undo" that action's allegedly harmful effects. *Foster v. Carson*, 347 F.3d 742, 746 (9th Cir. 2003) (citing *Bernhardt v. Cnty. of Los Angeles*, 279 F.3d 862, 871 (9th Cir. 2002)); *see also Seven Words LLC v. Network Solutions*, 260 F.3d 1089, 1095 (9th Cir. 2001). For example, "once a fact is widely available to the public, a court cannot grant 'effective relief' to a person seeking to keep that fact a secret." *Doe*, 697 F.3d at 1240; *see also Islamic Shura Council of S. Cal. v. FBI*, 635 F.3d 1160, 1164 (9th Cir. 2011); *In re Copley Press, Inc.*, 518 F.3d 1022, 1025 (9th Cir. 2008) ("Once information is published, it cannot be made secret again."). For this reason, "a case seeking to keep a document secret is moot once third parties have control over copies of the document." *Doe*, 697 F.3d at 1239 (quoting *C & C Prods., Inc. v. Messick*, 700 F.2d 635, 636–37 (11th Cir. 1983)). A case is similarly moot where a plaintiff seeks to enjoin specific parties from disclosing information that has already been published across the Internet. *Doe*, 697 F.3d at 1240.

#### b.  Application

Appellants' request for an injunction requiring the State to purge all records of their PRA disclosures does not present a live controversy.

Before commencing this lawsuit, Appellants voluntarily complied with all PRA reporting requirements, and they have continued to do so throughout this litigation. Appellants most recently filed PRA disclosures on January 17, 2014—more than two years after filing this appeal. Each PRA disclosure

that Appellants have submitted is published on the Secretary's website, and is publicly available in hard copy.[2]

The record is replete with evidence that Appellants' PRA disclosures have been accessed and republished by third parties. Appellants themselves provided detailed documentation of several websites that have published their contributors' names, employers, and addresses. Appellants also represent that: (1) one site allows individuals to search for "any city and print a map graphically illustrating the name, address, [contribution] amount, occupation, and employer of each individual in that city who contributed to Prop. 8"; (2) "at least two major California newspapers have compiled searchable databases . . . that enable easy access to look up Prop. 8 contributors"; and (3) Time Magazine directed its readership to a website that publishes the information contained in Appellants' PRA disclosures.

In light of the disclosures, and their vast dissemination, we can no longer provide Appellants with effective relief. The information that Appellants seek to keep private has been

---

[2] Specifically, since the PRA's January 31, 2009 reporting deadline, "ProtectMarriage.com - Yes on 8, a Project of California Renewal" has made seven additional filings. There was no committee activity between January 2009 and June 2011, but filings were made in June 2011, July 2011, January 2012, July 2012, January 2013, and July 2013. "National Organization for Marriage California - Yes on 8, Sponsored by National Organization for Marriage" has made two filings since the January 2009 deadline, in July 2009 and January 2010. There has been no committee activity since January 2010. Finally, "National Organization for Marriage California PAC" was formed subsequent to the November 2008 election, and joined in Plaintiffs' Third Amended Complaint. It has only made one filing, in July 2010, and its only donor was the National Organization for Marriage. In each instance, the information filed with the Secretary of State was posted on the Internet, and was and is available in hard copy.

publicly available on the Internet and in hard copy for nearly five years. Third parties already have control over this information. Moreover, we have no way of knowing how many individuals have: (1) viewed Appellants' PRA disclosures; (2) retained copies of the disclosures or their contents; or (3) reproduced the disclosures. Accordingly, we cannot remedy Appellants' alleged harms, and their request for an injunction requiring the State to purge their past PRA disclosures does not present a live controversy.[3]

---

[3] Our dissenting colleague does not dispute that our precedent compels this conclusion. Rather, Judge Wallace argues that *Doe* was wrongly decided in light of *Church of Scientology of California v. United States*, 506 U.S. 9 (1992). In *Church of Scientology*, the Supreme Court held that the improper disclosure of privileged audio tapes to the IRS did not moot a claim to destroy or return those tapes. *Id.* at 13. But *Church of Scientology* involved a finite set of tangible records that had only been disclosed to a party to the action. Accordingly, the Court was able to clearly identify each person who had viewed the information, and order that each copy be returned or purged. Conversely, in this case, as in *Doe*, the challenged information is in the hands of third parties over whom we lack jurisdiction, and it has been widely available on the Internet for several years. It is now impossible to identify how many people have viewed this information, locate every reproduction of this information, and prevent the information's continued disclosure. As in *Doe*, the widespread disclosure of Appellants' PRA disclosures precludes us from providing the "effective relief" that the Supreme Court recognized in *Church of Scientology*. We also observe that even if Judge Wallace were correct that *Doe* was wrongly decided, we would still be bound by *Doe*'s holding unless and until the Supreme Court announces a "clearly irreconcilable" rule, or our court, sitting en banc, announces an alternate rule. *Miller v. Gammie*, 335 F.3d 889, 900 (2003) (en banc). As noted, *Church of Scientology* is not "clearly irreconcilable" with *Doe*.

### 2.  Capable of Repetition, Yet Evading Review

We further hold that Appellants' request for injunctive relief does not fall within the mootness exception for cases that are "capable of repetition, yet evading review."

### a.  Legal Standard

As we explain above, a federal court loses its jurisdiction to reach the merits of a claim when the court can no longer effectively remedy a present controversy between the parties. *Doe*, 697 F.3d at 1238 (quoting *Feldman*, 518 F.3d at 642); *Nome Eskimo Cmty.*, 67 F.3d at 815. There is an exception to this rule, however, where an otherwise moot action is "capable of repetition, yet evading review." *Lewis*, 494 U.S. at 481. Under the "capable of repetition, yet evading review" exception, we will decline to dismiss an otherwise moot action if we find that: "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Wisc. Right to Life, Inc.*, 551 U.S. at 462 (internal quotation marks omitted).

For a controversy to be "too short to be fully litigated prior to cessation or expiration," it must be of "*inherently* limited duration." *Doe*, 697 F.3d at 1240 (emphasis added). This is so because the "capable of repetition, yet evading review" exception is concerned not with particular lawsuits, but with classes of cases that, absent an exception, would *always* evade judicial review.  *Id.* at 1240–41; *see also Bunker Ltd. P'ship v. United States* (*In re Bunker Ltd. P'ship*), 820 F.2d 308, 311 (9th Cir. 1987) ("[t]he exception was designed to apply to situations where the type of injury

involved inherently precludes judicial review"); 13C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedures: Jurisdiction and Related Matters* § 3533.8.2 (3d ed. 2013) (collecting cases). Notably, regardless of any injunction that might issue, a woman can only obtain an abortion so long as she remains pregnant. *Roe v. Wade*, 410 U.S. 113, 125 (1973). We can only invalidate a temporary injunction so long as that injunction remains in effect. *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 178–79 (1968); *Enyart v. Nat'l Conference of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1159–60 (9th Cir. 2011). And where a purportedly invalid law inhibits a political candidate or party's ability to win an election, we can only remedy that impediment before the election occurs. *Norman v. Reed*, 502 U.S. 279, 288–89 (1992). We recognize these types of controversies as "inherently limited in duration," because they will only ever present a live action until a particular date, after which the alleged injury will either cease or no longer be redressible. The limited duration of such controversies is clear at the action's inception.

Actions seeking to enjoin future conduct are different. Such actions only become moot if the challenged conduct actually occurs and causes an injury that cannot be reversed. These actions are not of "inherently limited duration," because the challenged conduct might never occur. And, a court can ensure that a live controversy persists until the action is fully litigated by enjoining the challenged conduct until the litigation concludes. *See Doe*, 697 F.3d at 1240–41.

Because mootness concerns whether we have power to hear a case, we apply the "capable of repetition, yet evading review" exception sparingly, and only in "exceptional situations." *Lewis*, 494 U.S. at 481. Controversies that are not

of "inherently limited duration" do not create "exceptional situations" justifying the rule's application, because, even if a particular controversy evades review, there is no risk that future repetitions of the controversy will necessarily evade review as well. As we have explained, "[t]he exception was designed to apply to situations where the type of injury involved inherently precludes judicial review, not to situations where . . . [review is precluded as a] practical matter." *Bunker*, 820 F.2d at 311.

For this reason, where preliminary injunctive relief is available to maintain a live controversy, it is of no consequence to the mootness inquiry that a particular party has failed to actually obtain such relief. "[A] party may not profit from the 'capable of repetition, yet evading review' exception . . . where through his own failure to seek and obtain [prompt relief] he has prevented [an] appellate court from reviewing the trial court's decision." *Id.* at 311; *see also Newdow v. Roberts*, 603 F.3d 1002, 1008–09 (D.C. Cir. 2010). In such circumstances, we have no power to hear the action, and the controversy must be resolved in a future action presenting a live dispute. *Doe*, 697 F.3d at 1241; *see also Headwaters, Inc. v. Bureau of Land Mgmt.*, 893 F.2d 1012, 1016 (9th Cir. 1990) (holding that a party may not invoke the "capable of repetition, yet evading review" exception where its failure to obtain prompt relief has prevented judicial review); *Bunker*, 820 F.2d at 311.

Lawsuits seeking to enjoin the disclosure of sensitive information do not fall into the mootness exception for cases that are "capable of repetition, yet evading review," because there is no inherent limit on the duration of such controversies. For example, in a case challenging campaign contribution disclosure requirements, the court can maintain

a live controversy by issuing an order that either: (1) temporarily excuses the plaintiffs from complying with the challenged requirements; or (2) temporarily precludes the state from disclosing the challenged information. *Doe*, 697 F.3d at 1240–41. Whether a party actually obtains such an order in a particular case does not affect our jurisdictional inquiry. *See id.*

### b.  Application

The "capable of repetition, yet evading review" exception does not apply to Appellants' claims, because there was no "inherent limit" on the duration of this controversy. A court order temporarily excusing Appellants from the PRA's reporting deadline or enjoining the state from publicly disclosing Appellants' filings could have permitted the parties to fully litigate this case on the merits. Appellants simply failed to obtain such an order.

After the district court denied Appellants' motion for a temporary restraining order, Appellants did not file an interlocutory appeal, nor did they seek an injunction pending appeal. By the time Appellants' claims reached us, the information that Appellants seek to keep private had been publicly available for nearly five years. If Appellants were to bring a similar action in the future, their claims would not, by their nature, again evade review, because a different litigation strategy could maintain a live controversy until the action's final resolution.[4]

---

[4] In concluding that this controversy is justiciable, the dissent argues that under *Enyart*, the "capable of repetition, yet evading review" exception considers whether the circumstances of a particular litigation allowed a party to fully litigate its claims before they became moot. But *Enyart* dealt

In reaching this conclusion, we emphasize that the justiciability of disputes concerning the disclosure of

---

with an issue of an entirely different nature.

It is well established that when a party challenges a temporary injunction and that party will likely face a similar injunction in the future, the injury caused by that injunction is "capable of repetition, yet evading review." *Carroll*, 393 U.S. at 178–79. This is so because any injury caused by a temporary injunction ends when the injunction expires, and no court order can extend the duration of the controversy past the injunction's expiration. *Enyart* involved a straightforward application of this rule. We merely held that a challenge to a temporary injunction remained justiciable after the injunction expired because there was a reasonable expectation that the appellants would be subject to the same injunction in the future. 630 F.3d at 1159–60.

The dissent reasons that, because we considered the duration of the challenged injunctions in *Enyart*, we should consider this litigation's timeline in assessing whether Appellants' claims "evade review." In so doing, the dissent highlights that there was only one day between the issuance of the district court's order denying preliminary injunctive relief and the PRA's January 31, 2009 disclosure deadline.

The dissent errs with regard to the time-frame that is relevant to whether a controversy inevitably "evades review." As we explain above, a controversy "evades review" only if it is of "inherently limited duration." *Bunker*, 820 F.2d at 311 ("[t]he exception was designed to apply to situations where *the type of injury involved* . . . [evades review] by [its] nature" (emphasis added)). A case is not of "inherently limited duration" if a court order could maintain a live controversy until the action is fully litigated.

While the timing of the district court's order made it difficult for Appellants to maintain a live controversy in this case, we can no longer redress Appellants' alleged injuries, and we therefore lack jurisdiction over this appeal. Despite the dissent's contrary assertions, the poor timing of the district court's order cannot confer jurisdiction upon us that would not otherwise exist.

sensitive information may well turn on whether preliminary relief is granted at an action's inception. As this case demonstrates, the premature disclosure of information can eviscerate a live controversy. Nevertheless, the fact that preliminary relief is technically *available* to maintain a live controversy will also deprive federal courts of jurisdiction to consider the action as one that is "capable of repetition, yet evading review." Accordingly, we advise courts to exercise the utmost caution at the early stages of actions concerning the disclosure of sensitive information, and to consider this "mootness Catch-22" when assessing whether the denial of preliminary relief will likely result in irreparable harm. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## B.  Ripeness

Finally, Appellants urge that they are entitled to an injunction exempting them from complying with future PRA disclosure requirements, because they expect to participate in future campaigns opposing same-sex marriage. This claim for forward-looking relief is not ripe for judicial review.

### 1.  Legal Standard

The ripeness doctrine seeks to identify those matters that are premature for judicial review because the injury at issue is speculative, or may never occur. *Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 793 (9th Cir. 2012); *see also Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967). "For adjudication of constitutional issues, concrete legal issues, presented in actual cases, not abstractions, are requisite." *United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947) (internal quotations omitted). Concrete legal issues

require more than mere "hypothetical threat[s]," and where we can "only speculate" as to the specific activities in which a party seeks to engage, we must dismiss a claim as nonjusticiable. *Id*. at 90.

We have explained that "the ripeness inquiry contains both a constitutional and a prudential component." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc). The constitutional component overlaps with, and is often indistinguishable from, the "injury in fact prong" of our standing analysis. *Id.* Whether we view injury in fact as a question of standing or ripeness, "we consider whether the plaintiff[] face[s] a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement . . . or whether the alleged injury is too imaginary or speculative to support jurisdiction." *Id*. at 1139 (internal quotation marks and citations omitted). If this constitutional requirement is not satisfied, we lack jurisdiction, and we need not consider the prudential component of the ripeness inquiry.

We typically look to three factors to assess whether a pre-enforcement challenge is ripe for review under Article III. *Id.* We first consider whether the plaintiff articulates a "concrete plan to violate the law." *Id.* (internal quotation marks omitted). With regard to this prong, "[a] general intent to violate a statute at some unknown date in the future" is not sufficient, *id*, and the plaintiff must establish a plan "that is more than hypothetical," *Wolfson v. Brammer*, 616 F.3d 1045, 1059 (9th Cir. 2010).

Next, we typically look to whether the government has "communicated a specific warning or threat to initiate proceedings" under the statute. *Thomas*, 220 F.3d at 1139.

Our analysis under this second prong is somewhat different, however, in a pre-enforcement challenge that alleges a free speech violation under the First Amendment. *See Wolfson*, 616 F.3d at 1059–60. In such actions, the plaintiff need not establish an actual threat of government prosecution. *Id.* Rather, the plaintiff need only demonstrate that a threat of potential enforcement will cause him to self-censor, and not follow through with his concrete plan to engage in protected conduct. *Id*.

Finally, we consider the history of past prosecution or enforcement under the statute. *Thomas*, 220 F.3d at 1140. Under this third prong, "the government's active enforcement of a statute [may] render[] the plaintiff's fear [of injury] . . . reasonable." *Id*.

Weighing these factors, we will only conclude that a pre-enforcement action is ripe for judicial review if the alleged injury is "reasonable" and "imminent," and not merely "theoretically possible." *Id*. at 1141. A claim is not ripe where "[t]he asserted threat is wholly contingent on the occurrence of unforeseeable events," or where the plaintiffs do not "confront a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Id*. (internal quotation marks and citations omitted).

The application of these principles is illustrated in *Renne v. Geary*, 501 U.S. 312 (1991), in which the Supreme Court dismissed a challenge to a provision in the California constitution prohibiting political parties and committees from endorsing, supporting, or opposing candidates for nonpartisan offices. In that case, the Republican Committee submitted an affidavit stating:

It is the plan and intention of the Republican Committee to endorse candidates for nonpartisan offices in as many future elections as possible. The Republican Committee would like to have such endorsements publicized by endorsed candidates in their candidate's statements in the San Francisco voter's pamphlet, and to encourage endorsed candidates to so publish their endorsements by the Republican Committee.

*Id.* at 317.

In holding that the Republican Committee did not present a ripe controversy, the *Renne* Court explained that "[the Committee] d[id] not allege an intention to endorse any particular candidate . . . . [and there is] no factual record of an actual or imminent application of [the challenged provision] sufficient to present the constitutional issues . . . ." *Id*. at 321–22 (citations omitted).

## 2. Application

At this stage, any as-applied challenge based on Appellants' future activity fails to "tender[] the underlying constitutional issues in clean cut and concrete form." *Socialist Labor Party v. Gilligan*, 406 U.S. 583, 588 (1972) (quoting *Rescue Army v. Mun. Court*, 331 U.S. 549, 584 (1947)). The only information that we have regarding Appellants' intended future activities is that Appellants expect to participate in future campaigns opposing same-sex marriage, and that, in so doing, they wish not to comply with the PRA's disclosure requirements.

Appellants have not offered any information regarding when they may next support a campaign opposing same-sex marriage, what type of campaign they will support, where they will support it, what their involvement will entail, or whether their donors will likely face personal harassment. Without this information, we cannot discern a concrete plan to engage in protected conduct. Rather, the scant information that Appellants provide merely demonstrates "[a] general intent to [engage in protected conduct] at some unknown date in the future," along with a speculative fear that Appellants' donors may be personally harassed as a result of disclosing their contributions to such an effort. *Wolfson*, 616 F.3d at 1059. These hypothetical plans and fears do not create an immediate threat of self-censorship. And, as in *Renne*, there is no factual record of the State's bringing PRA enforcement actions against those who do not comply with the statute's disclosure requirements. *Renne*, 501 U.S. at 321–22. Accordingly, any claim based on Appellants' future activities is not ripe under the *Thomas* factors.

In reaching this conclusion, we emphasize that we have "no right to pronounce an abstract opinion upon the constitutionality of a [s]tate law," *Poe v. Ullman*, 367 U.S. 497, 504 (1961). As-applied challenges to contribution disclosure laws are fact-specific in nature. Whether a group will succeed in asserting such a challenge depends on factors such as the group's size, the nature of the campaign, the political tenor in the community, and the actions of third parties and government entities. *See Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U.S. 87, 89–92 (1982). Unlike *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088 (9th Cir. 2003) and *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495 (10th Cir. 1995)—upon which the dissent relies—any opinion that we

could issue regarding Appellants' forward-looking claims would require us to speculate about the nature of events that might take place at some unknown time in the future, and to declare the constitutionality of a state law in the context of these uncertain circumstances. Under Article III, we lack the authority to issue such an opinion. *See Renne*, 501 U.S. at 323 ("[a] determination of the . . . constitutionality of legislation[,] in advance of its immediate adverse effect in the context of a concrete case[,] involves too remote and abstract an inquiry for the proper exercise of the judicial function").

## CONCLUSION

For the foregoing reasons, we affirm the district court's judgment with regard to Appellants' facial challenges. We dismiss this appeal as non-justiciable with regard to Appellants' as-applied challenges, and we remand these claims to the district court with instructions that the court vacate the portion of its opinion concerning Appellants' as-applied challenges. *See Bunker*, 820 F.2d at 313. Appellants shall bear costs on appeal.

**AFFIRMED in part; DISMISSED in part; and REMANDED with instructions.**

WALLACE, Circuit Judge, dissenting in part:

I do not disagree with the majority's disposition of Appellants' facial challenges. The majority is correct that our precedent, including our decision in *Family PAC v. McKenna*, 685 F.3d 800 (9th Cir. 2012), forecloses those challenges. However, I disagree with the majority's

determination that Appellants' as-applied challenges are non-justiciable.

The majority offers three rationales for its holding that Appellants' as-applied challenges are non-justiciable. First, the majority concludes that those challenges are moot, insofar as various Internet websites have republished the information contained in Appellants' disclosures. (Majority Op. at 14.) Second, the majority concludes that Appellants cannot avail themselves of the "capable of repetition, yet evading review" exception to mootness. The majority reaches this conclusion on the ground that this exception only applies to cases in which there is an "inherent limit" on the "duration of [the] controversy," and faults Appellants for not seeking and obtaining immediate relief from our court after the district court denied their motion for a temporary restraining order. (*Id.* at 17–22.) Finally, the majority concludes that insofar as Appellants seek an injunction exempting them from complying with future disclosure requirements, this claim is not ripe because it rests on merely speculative contentions from Appellants about their future activities. (*Id.* at 22–27.)

For the reasons stated below, I disagree with each of these three conclusions. Accordingly, I respectfully dissent from the majority's decision to dismiss Appellants' as-applied challenges as non-justiciable.

I.

The majority holds that Appellants' request for an injunction requiring California to purge all records of their disclosures does not "present a live controversy." (Majority Op. at 14.) The majority's reasoning as to this issue relies on our decision in *Doe No. 1 v. Reed*, 697 F.3d 1235 (9th Cir.

2012).  However, I believe that *Reed* was wrongly decided, as Judge Randy Smith explained in his concurrence in that case. *See id.* at 1241 (N.R. Smith, J., concurring in the judgment).

*Reed* involved facts much like those presented in this appeal.  The plaintiffs in that case sought an injunction preventing the State of Washington from releasing to the public the names of people who signed petitions supporting a referendum.  *Id.* at 1237.  Because those petitions were "already widely available on the [I]nternet," the majority dismissed the case as moot.  *Id.*

While Judge Randy Smith concurred with the judgment, he wrote separately to explain that "Supreme Court precedent makes clear" that the case was not moot, insofar as "continued government disclosure of confidential materials can be prevented."  *Id.* at 1241.  As he explained, our court could have afforded the plaintiffs a "viable remedy, albeit a much less effective remedy than they originally sought."  *Id.* As he further explained, there were several respects in which a "viable remedy" was available from us.  First, our court could have "fashion[ed] *some* form of meaningful relief" by "ordering the [State] to destroy or return any and all copies [of the petitions] it may have in its possession," because the State's "*continued possession* of those materials" itself constituted an "affront to the [citizen's] privacy."  *Id*. at 1242–43, *quoting Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12–13 (1992).  Second, he pointed out that the majority had "mistakenly assume[d] that every person in the United States or the State of Washington has access to a computer to search for [the] petitions," whereas in actuality a significant percentage of the public either lacks access to the Internet or "would not know where to look for [the] petitions" on the Internet.  *Id.* at 1243.  Thus, by granting the

plaintiffs the injunctive relief they requested, our court could have "prevent[ed] further government disclosure to individuals without access or desire to download petitions from non-government websites," which would have slowed or reduced "the dissemination of potentially private information." *Id.*, *citing Massachusetts v. E.P.A.*, 549 U.S. 497, 525 (2007).

I agree with the reasoning of Judge Smith's concurrence in *Reed*. I write here to emphasize that the Supreme Court's decision in *Church of Scientology of California v. United States* clearly states that the type of claim raised by the plaintiffs in *Reed*, and by Appellants in this case, is not moot. There, the Court acknowledged that there are circumstances in which the judiciary "may not be able to return the parties to the *status quo ante*," because there is "nothing a court can do to withdraw all knowledge or information" once that information has been disseminated. *Church of Scientology*, 506 U.S. at 12–13. Nonetheless, *Church of Scientology* held that "a court can fashion *some* form of meaningful relief" in such circumstances. *Id.* The Court stated that "even if the Government retains only copies of the disputed materials," a citizen "still suffers injury by the Government's continued possession of those materials, namely, the affront to the [citizen's] privacy." *Id.* at 13. Accordingly, *Church of Scientology* held that "a court does have power to effectuate a partial remedy by ordering the Government to destroy or return any and all copies it may have in its possession," and further held that the "availability of this possible remedy is sufficient to prevent [a] case from being moot." *Id.*

The majority in *Reed* failed to recognize that *Church of Scientology* is controlling. Instead, it ignored the holding of *Church of Scientology* on the basis of its "commonsense

conclusion that once a fact is widely available to the public, a court cannot grant any 'effective relief' to a person seeking to keep that fact a secret." *Reed*, 697 F.3d at 1240. It should go without saying, however, that the "commonsense conclusion" of two circuit judges cannot trump an express holding of the Supreme Court. *Church of Scientology* is still the controlling law of all circuits, including the Ninth Circuit. *Reed* cannot change that. Indeed, the majority should have interpreted *Reed* in such a way as to render it consistent with *Church of Scientology*.

As *Church of Scientology* makes clear, we could order the State of California to "destroy or return any and all copies" of Appellants' disclosures that the State "may have in its possession." *Church of Scientology*, 506 U.S. at 13. Thus, under binding Supreme Court precedent, there is available to us a "possible remedy" that is "sufficient to prevent this case from being moot." *Id.*

The majority goes the opposite direction, and attempts to distinguish *Church of Scientology* by stating that *Church of Scientology* involved "a finite set of tangible records that had only been disclosed to a party to the action," whereas this case involves records that have been "widely available on the Internet for several years." (Majority Op. at 16 n.3.) Thus, the majority concludes that we cannot provide "the 'effective relief' that the Supreme Court recognized in *Church of Scientology*." (*Id.*) But this conclusion simply repeats the error of the panel in *Reed*. As pointed out above, *Church of Scientology* clearly holds that a case is not moot if we can "effectuate a partial remedy by ordering the Government to destroy or return any and all copies [of records] it may have in its possession." *Church of Scientology*, 506 U.S. at 13. The fact that records may have been "widely available" on

the Internet is not relevant to the inquiry mandated by *Church of Scientology*.   Again, that inquiry is whether we can "fashion *some* form of meaningful relief" by remedying the "injury" to citizens caused by the "Government's continued possession" of records, where that possession is an "affront" to the citizen's privacy.  *Id.* at 12–13.

*Church of Scientology* teaches that courts should not declare a case moot if "*any* effective relief may be granted." *Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006) (citation omitted).  As one of our sister circuits has explained, this is a "high threshold for judging a case moot," insofar as it requires that we find an appeal "moot in the constitutional sense only if events have taken place that make it impossible for the court to grant any effectual relief whatever." *United Artists Theatre Co. v. Walton*, 315 F.3d 217, 226 (3d Cir. 2003) (internal quotation marks and citation omitted).  Both *Reed* and the majority in this case err by effectively lowering this standard, in contravention of *Church of Scientology*.  That opinion tells us that we should find a case moot only if it is "impossible" for us to grant "any effectual relief whatever." *Church of Scientology*, 506 U.S. at 12.  By contrast, the majority holds that this case is moot because it is *unlikely* that we will be able to provide *significant* effective relief.  But that is not the standard set by *Church of Scientology*.

For the reasons stated above, and in accordance with the well-reasoned concurrence of Judge Randy Smith in *Reed*, I conclude that *Reed* was wrongly decided.   Under the governing law of *Church of Scientology*, Appellants' as-applied challenges are not moot.  The majority should have

distinguished *Reed* and followed *Church of Scientology*, not the opposite.[1]

## II.

Having concluded that Appellants' as-applied challenges are moot, the majority proceeds to consider whether those challenges may nonetheless be subject to the exception to mootness for injuries that are "capable of repetition, yet evading review." As discussed above, I do not believe that the as-applied challenges are moot. But even if they were moot, I believe that the majority errs in concluding that the "capable of repetition, yet evading review" exception to mootness does not apply to this case.

The majority correctly states that the "capable of repetition, yet evading review" exception applies where: "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007). In my view, Appellants satisfy both of these requirements. I consider each in turn.

---

[1] As the majority observes, this panel is bound by the holding in *Reed* "unless and until the Supreme Court announces a 'clearly irreconcilable' rule, or our court, sitting en banc, announces an alternate rule." (Majority Op. at 16 n.3.) My purpose here is to explain the misguided reasoning of *Reed*, in the hope that our court will reconsider the erroneous rule it propounds, or distinguish *Reed* and follow the clear mandate of the Supreme Court in *Church of Scientology*.

A.

As to the first requirement, Appellants filed their original complaint on January 7, 2009, two months after the election on Proposition 8 took place.   Under California law, Appellants were required to disclose the names of their contributors by January 31, 2009.  As the majority observes, the district court denied Appellants' motion for a preliminary injunction on January 30, 2009. (Majority Op. at 7.)  The next day, Appellants complied with the law and made their disclosures.  (*Id.*)  Such a short span of time is clearly "in its duration too short" for a claim of this nature to be "fully litigated."  *Wis. Right to Life*, 551 U.S. at 462.

The majority does not contend that this claim could have been "fully litigated" in so brief a time.  Rather, it faults Appellants for failing to seek preliminary injunctive relief, and concludes that their failure to do so precludes this claim from falling under the "capable of repetition, yet evading review" exception to mootness.  In reaching this conclusion, the majority relies upon our opinions in *Headwaters, Inc. v. Bureau of Land Management*, 893 F.2d 1012 (9th Cir. 1990), and *Bunker Ltd. Partnership v. United States*, 820 F.2d 308 (9th Cir. 1987).  However, I believe that these opinions do not preclude us from deciding that the "capable of repetition, yet evading review" exception applies to this case.

In *Headwaters*, we stated that "[w]here prompt application for a stay pending appeal can preserve an issue for appeal, the issue is not one that will evade review." *Headwaters*, 893 F.2d at 1016.  Likewise, in *Bunker* we stated that "a party may not profit from the 'capable of repetition, yet evading review' exception to mootness, where through his own failure *to seek and obtain a stay* he has

prevented an appellate court from reviewing the trial court's decision." *Bunker*, 820 F.2d at 311 (emphasis added). But the abstract proposition stated in both of these cases—i.e., the proposition that if a party "fail[s] to seek and obtain a stay," that party may not avail itself of the "capable of repetition, yet evading review" exception to mootness—does not speak to the particular facts of *this* case. As pointed out above, the district court issued its order on Appellants' motion for a preliminary injunction on January 30, 2009, while Appellants were required to make their disclosures by January 31, 2009. Thus, under the majority opinion, Appellants would have had a *single day* to "seek and obtain a stay" from our court in order to "profit from the 'capable of repetition, yet evading review' exception to mootness." *Id.* This draconian constraint is not established by the opinions cited by the majority, which merely speak in general terms of a party's obligation to "seek and obtain a stay" so as to enable our court to review the lower court's decision.

A recent case in one of our sister circuits emphasizes the unfair position in which Appellants have been placed by the majority's holding as to this issue. On December 20, 2013, the District of Utah held that Amendment 3 of the Utah Constitution is unconstitutional, and enjoined the State of Utah from enforcing various statutory provisions that "prohibit a person from marrying another person of the same sex." *Kitchen v. Herbert*, 2013 WL 6697874, at *30 (D. Utah Dec. 20, 2013). A few hours after that order was issued, the State of Utah filed a motion to stay the order. *See Kitchen v. Herbert*, 2013 WL 6834634, at *1 (D. Utah Dec. 23, 2013). Although the district court ordered expedited briefing, it did not rule on the motion to stay for three days. *See id.* It was not until two weeks later that the Supreme Court issued a stay

pending final disposition of the appeal by the Tenth Circuit. *See Herbert v. Kitchen*, 134 S. Ct. 893, 893 (2014).

As this example illustrates, it is simply not realistic to expect a party to "seek and obtain a stay" within the span of a single day. Yet that is what the majority effectively requires. On the facts of this case, I would hold that our decisions in *Headwaters* and *Bunker* do not prohibit Appellants from satisfying the first requirement of the "capable of repetition, yet evading review" exception to mootness.

The majority asserts that the analysis above errs by focusing on the wrong "time-frame" for determining whether "a controversy inevitably 'evades review.'" (Majority Op. at 21 n.4.) The majority's contrary analysis hinges on its discussion of "types of controversies" that are "inherently limited in duration." (*Id.* at 17.) The majority argues that the mootness exception discussed here only applies to "inherently limited" controversies, which it defines as those that "will only ever present a live action until a particular date, after which the alleged injury will either cease or no longer be redressible." (*Id.* at 18.)

To my mind, the majority's discussion of an "inherently limited" controversy is somewhat metaphysical. The present controversy unquestionably had an "inherent limit": namely, January 31, 2009, when Appellants were required by law to make their disclosures. In the same way, a controversy involving a law that "inhibits a political candidate or party's ability to win an election" has, as *its* "inherent limit," the date of that election. (*Id.* at 18.) Whatever distinction might be drawn between these two scenarios, it cannot be that only the latter has an "inherent limit."

Although the majority does not say as much, it appears to posit a distinction between controversies whose "inherent limit" is a real-world event and those whose "inherent limit" is an artificial creation of the legal system. An example of the former, which the majority regards as "[n]otabl[e]," is pregnancy, insofar as the date on which a baby is born is independent of anything the law might decree. (*Id.*) By contrast, the limit in this case was the disclosure deadline mandated by California state law.

This distinction is not established by the cases the majority cites. Moreover, I believe that this distinction, although crucial to the majority's holding, cannot be reconciled with our precedent. In effect, the majority has established a new test for determining whether this exception to mootness applies to a given case. Under the newly invented test of the majority, in cases in which the "inherent limit" on the controversy derives from some real-world event— such as a pregnancy—the exception will invariably apply. By contrast, in cases in which the "inherent limit" derives from an event that may be delayed via court order, the exception will *never* apply, because it will always be possible for a "court [to] ensure that a live controversy persists until the action is fully litigated by enjoining the challenged conduct until the litigation concludes." (*Id.* at 18.)

Although such a test may have a certain intuitive appeal, it is not the law of our circuit, as the majority's own citations indicate. The majority relies on *Bunker*, which held that a party "may not profit" from this exception to mootness "where through *his own failure to seek and obtain* [prompt relief] he has prevented [an] appellate court from reviewing the trial court's decision." (*Id.* at 19, *citing Bunker*, 820 F.2d at 31 (emphasis added).) This citation demonstrates the

obvious novelty of the test introduced by the majority. In *Bunker*, we held that the significant factor, in determining whether this exception to mootness applies, is a party's "own failure to seek and obtain" relief. That is, in our analysis of this exception to mootness we looked to the *party's own diligence* in seeking relief, rather than evaluating the case in the abstract and determining whether it was the "type[] of controvers[y]" that is invariably "inherently limited in duration." (*Id.* at 18.)

Put another way, the majority holds that this exception to mootness is only available in cases whose "limited duration . . . is clear at the action's inception." (*Id.* at 18.) But the cases relied upon by the majority consider a party's "failure to obtain prompt relief" *during* an action. (*Id.* at 19.) If it were true that the question of whether this exception to mootness applies could be resolved solely by considering an action in abstract form from its "inception," then there would have been no reason for our prior cases to consider a party's "failure to seek and obtain" relief over the course of litigating the action. The new majority rule is inconsistent with our prior case law.

Thus, the majority's holding here clearly creates new law for our circuit, and does so in a way that cannot be reconciled with our court's precedent. The majority relies on *Reed* for its reasoning as to this point. (*Id.* at 18–20.) I quote below the entirety of the discussion of this issue in *Reed*:

> There was no inherent limit on the duration of this controversy. The district court granted a temporary restraining order the day after Plaintiffs filed their complaint in July 2009. The petitions were not released until October

2011. The release was not timed to a 27-month deadline inherent in this type of petition. And unlike [other] election-related cases granting an exception . . . the issues in this case were not moot once the election was held. [citation omitted] Because it is reasonably foreseeable that this type of challenge could be fully litigated before becoming moot, this type of challenge does not evade review.

*Reed*, 697 F.3d at 1240–41.

Whatever might be said of this holding, it does not provide a justification for the novel test that the majority has invented.

In similar contexts, we have not relied upon the distinction used by the majority to preclude review of this case under this exception to mootness. Our recent decision in *Enyart v. National Conference of Bar Examiners, Inc.*, 630 F.3d 1153 (9th Cir. 2011), is instructive in this regard. In *Enyart*, we considered an appeal from preliminary injunctions entered by the district court. *Id.* at 1159. Those injunctions required the National Conference of Bar Examiners to allow the plaintiff to take certain bar examinations using "assistive software." *Id.* at 1156. We held that even though those injunctions only related to particular administrations of those examinations, "which [had] since come and gone," the appeals were not moot because "the situation [was] capable of repetition, yet evading review." *Id.* at 1159. As we explained, "[d]ue to the limited duration of [the] injunctions," and in particular because "little more than a month passed between the issuance of the injunctions and the final

execution of their terms," it was "practically" impossible for the appellant to obtain review of the district court's orders. *Id.* at 1160.

Thus, in *Enyart*, we held that a period of "little more than a month" rendered it "practically" impossible for a party to obtain appellate review. *Id.* By the same logic, it was almost certainly impossible for Appellants to obtain review from us of the district court's order on Appellants' motion for a preliminary injunction in the single day available to them.

The majority attempts to distinguish *Enyart* by stating that it "dealt with an issue of an entirely different nature." (Majority Op. at 20–21 n.4.) The point of my discussion of *Enyart*, however, is that it considered whether a party could "practically obtain appellate review" of a district court order. *Enyart*, 630 F.3d at 1160. This reinforces my point that the relevant inquiry, when considering this exception to mootness, is a *pragmatic* one—namely, whether it is practically possible for a party to obtain the appellate relief it needs—rather than the *metaphysical* one mandated by the majority.

In sum, because it was practically impossible under the facts of this case for Appellants to obtain appellate review, I would hold that Appellants have satisfied the first requirement of the "capable of repetition, yet evading review" exception to mootness.

## B.

In light of its conclusion that Appellants failed to satisfy the first requirement of the "capable of repetition, yet evading review" exception to mootness, the majority does not address

the second requirement—namely, the requirement that there must be a "reasonable expectation that the same complaining party will be subject to the same action again." *Wis. Right to Life, Inc.*, 551 U.S. at 462. Because I believe the majority's conclusion as to the first requirement is erroneous, I proceed to consider the second requirement as well, so as to demonstrate that Appellants have completely satisfied the requirements for this exception to mootness.

In this case, Appellants have alleged that they intend to engage in future political activities against same-sex marriage and that they intend to continue soliciting donations to advance that position. Their Third Amended Complaint alleges that "Committee Plaintiffs believe potential contributors have been *and will continue to be* discouraged from contributing to their committees as a result of the threats and harassment directed at any individual supporting a traditional definition of marriage" (emphasis added). Moreover, at oral argument, counsel for Appellants stated that future ballot initiatives are being circulated and that Appellants' committees are ready to participate in such initiatives by filing amendment documents, at which point they would resume soliciting donations.

Under our precedent, this is sufficient to show a "reasonable expectation that [Appellants] will be subject to the same action again." *Id.* The case of *Wolfson v. Brammer*, 616 F.3d 1045, 1054 (9th Cir. 2010), is exactly on point. *Wolfson* involved an appellant who was a "candidate for judicial office in Arizona." *Id.* at 1051. The district court had dismissed the case as moot, insofar as Wolfson had lost his election and the district court found that he "did not intend to seek judicial office in the next election." *Id.* at 1052. We reversed, holding that the case was not moot under the

"capable of repetition yet evading review" exception. *Id.* at 1052, 1054. In particular, we observed that Wolfson had to "establish a reasonable expectation that he [would] be subjected to the same action or injury again." *Id.* We concluded that he had established such a "reasonable expectation." *Id.* at 1055. In reaching this conclusion, which was predicated on our assessment that there was "more than sufficient evidence to support a finding that Wolfson intends to seek judicial office in the future," we relied on two facts. *Id.* at 1054–55. First, we observed that "Wolfson's complaint expresses an intention to seek judicial office in the future, and a desire to engage in prohibited conduct . . . in future judicial elections." *Id.* Second, we observed that Wolfson had "eliminat[ed] any doubts" as to this issue by "represent[ing] in the present appeal that he intends to seek judicial office in a future election." *Id.*

The same type of evidence is present in this case. First, as stated above, Appellants' complaint expresses an intention to engage in similar conduct in the future, insofar as it alleges that future contributors "will continue to be discouraged." Second, as is also pointed out above, Appellants' counsel represented in the present appeal that Appellants intend to engage in similar campaigns against same-sex marriage in the future. Therefore, under *Wolfson*, Appellants have established a "reasonable expectation" that they will be subject to the same action again, and thus have satisfied the second requirement of the "capable of repetition, yet evading review" exception to mootness.

III.

Finally, the majority invokes the ripeness doctrine to conclude that Appellants' "claim for forward-looking relief"

is non-justiciable. (Majority Op. at 22.) The majority correctly identifies our guidelines for the ripeness inquiry, which we articulated in our en banc opinion in *Thomas v. Anchorage Rights Commission.* 220 F.3d 1134 (9th Cir. 2000) (en banc); *see also Alaska Right to Life Political Action Comm. v. Feldman*, 504 F.3d 840, 845, 849 (9th Cir. 2007) (following the ripeness analysis from *Thomas* in considering a "preenforcement challenge" to two canons of the Alaska Code of Judicial Conduct); *Jacobus v. Alaska*, 338 F.3d 1095, 1104–05 (9th Cir. 2003) (applying the ripeness analysis from *Thomas* in an action involving a challenge to a state campaign finance law). As *Thomas* explains, "the ripeness inquiry contains both a constitutional and a prudential component." *Thomas*, 220 F.3d at 1138 (citation omitted). First, there is a constitutional aspect to the ripeness inquiry, under which we ask three questions: (1) "whether the plaintiffs have articulated a 'concrete plan' to violate the law in question"; (2) "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings"; and (3) "the history of past prosecution or enforcement under the challenged statute." *Id.* at 1139. Second, there is a prudential aspect to the ripeness inquiry, under which we consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 1141.

In light of the ripeness inquiry described by *Thomas*, and in light of our consideration of that inquiry in a very similar context in *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088 (9th Cir. 2003), I believe that Appellants' claim is ripe.

In *Getman*, we considered a similar challenge to California's campaign finance disclosure laws. *Id.* at 1091–92. As a threshold matter, we determined whether that

challenge was ripe. *Id.* at 1093–95. The district court, following the approach set forth in *Thomas*, had concluded that the action was not ripe, insofar as California was not investigating the plaintiff for violations of the state's campaign finance disclosure law and had not threatened the plaintiff with prosecution. *Id.* at 1094. We held that the district court's interpretation of *Thomas* "must be rejected." *Id.* In doing so, we emphasized that in the context of First Amendment challenges, the "Supreme Court has endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences." *Id.* (citation omitted). We determined that the "intended communication" that was the subject of the litigation was "arguably subject" to the "reporting and disclosure requirements" of California's Political Reform Act (PRA)—i.e., the same act that is at issue in this case. *Id.* at 1095. From that fact alone, we concluded that the plaintiff had "suffered an injury as a result of the alleged unconstitutional statute," which meant that its claim was "necessarily ripe for review." *Id.* Likewise, here, it is beyond question that Appellants' intended future activities, as discussed above, are subject to the reporting and disclosure requirements of the PRA, which in turn means that their claims are "necessarily ripe for review."

Although the majority pays lip service to our ripeness analysis in *Thomas*, its actual resolution of this issue is largely reliant on the Supreme Court's decision in *Renne v. Geary*, 501 U.S. 312 (1991), which predates our opinion in *Thomas*. In my view, the majority's reliance on *Renne* is misguided. In the portion of *Renne* discussed by the majority, the Court stated that it could "discern no ripe controversy in the allegations that respondents desire to endorse candidates in future elections," insofar as the respondents did not "allege

an intention to endorse any particular candidate, nor that a candidate wants to include a party's or committee member's endorsement in a candidate statement." *Id.* at 321. The Court went on to assert that the respondents had failed to "specify what form [the] support or opposition [of a particular candidate] would take." *Id.* at 322. Here, by contrast, we know that Appellants have a very particular intention, and that they have specified the form their opposition would take: they intend to oppose same-sex marriage via ballot measures. Thus, because we held that the post-*Renne* case of *Getman* was ripe, I would hold that this case is ripe.

My view that *Renne* does not preclude us from holding that this case is ripe is further supported by the Tenth Circuit's well-reasoned opinion in *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495 (10th Cir. 1995). In *Richardson*, the Tenth Circuit held that a plaintiff's constitutional challenge to a state campaign finance law was ripe. *Id.* at 1497. In particular, the court held that the "facts presented to the district court undoubtedly show[ed that] the existence of the New Mexico statute [had] created a direct and immediate dilemma with respect to [the plaintiff's] exercise of his First Amendment liberties." *Id.* at 1500. In this regard, the court considered affidavits submitted to the district court showing that the plaintiff had solicited campaign contributions in the past, and that the statute had "reduc[ed] the likelihood" that the plaintiff would be "able to obtain funds from contributors" in the future. *Id.* On the basis of these facts, the court concluded that it was "clear to us that the mere existence of the New Mexico statute has caused [the plaintiff] to engage in the activity of fund raising differently than he has in the past, rendering his ability to raise funds, and thus exercise his constitutionally protected rights, less effective." *Id.* at 1500–01. Therefore, the court

concluded that there was "nothing speculative or uncertain about the harm to [the plaintiff's] fund raising activities brought about by" the statute, which in turn meant that the case was ripe. *Id.* at 1501–02.

Just as in *Richardson*, in this case the record contains ample affidavits submitted to the district court showing that Appellants have solicited contributions in the past, and that the State of California's disclosure of contributors' identifying information has reduced the likelihood that Appellants will be able to obtain funds from contributors in the future. Thus, as the Tenth Circuit concluded in *Richardson*, I would hold here that there is nothing "speculative or uncertain about the harm" to Appellants' fund-raising activities caused by California's campaign disclosure law, and that their claim is therefore ripe.

A separate reason for concluding that *Renne* does not block Appellants' claim is also provided by the Tenth Circuit's opinion in *Richardson*. The court in *Richardson* expressly considered *Renne*, and concluded that the case before it was ripe notwithstanding *Renne*. As the Tenth Circuit explained, *Renne*'s holding was largely predicated on the particular "facts presented" in that case, and especially on "the dubiousness of plaintiffs' standing to bring the case." *Id.* at 1501 n.1. The *Renne* plaintiffs' standing was "dubious[]" because they were a "group of individual voters" who were challenging a law that "regulated political parties and central committees." *Id.* That is, because the law at issue in *Renne* "contained no enforcement mechanism against individual voters and, indeed, did not even regulate the conduct of individual voters, it follow[ed] logically that [the plaintiffs] faced no threat of prosecution by virtue of that [law]." *Id.*

The Tenth Circuit found further support for this interpretation of *Renne* in Justice Stevens's concurring opinion. Justice Stevens stated there that "[i]f such a challenge had been brought by a political party or a party central committee [i.e., by the type of plaintiff to whom the law was addressed], and if the complaint had alleged that these organizations wanted to endorse, support, or oppose a candidate for nonpartisan office but were inhibited from doing so because of the [law], the case would unquestionably be ripe." *Id.*, *quoting Renne*, 501 U.S. at 325 (Stevens, J., concurring). Justice Stevens made it clear that his reservations about ripeness in the case were predicated on his belief that "an individual member of a party or committee may [not] sue on behalf of such an organization." *Renne*, 501 U.S. at 325 (citation omitted). Here, by contrast, it is clear that the California law at issue—i.e., the PRA—regulates Appellants' conduct, which means that the case "unquestionably [is] ripe." *Id.*

The majority attempts to distinguish both *Getman* and *Richardson* by asserting that, "[u]nlike" in those cases, "any opinion that we could issue regarding Appellants' forward-looking claims would require us to speculate about the nature of events that might take place at some unknown time in the future." (Majority Op. at 26–27.) But such "speculation" was present in *Getman*. In *Getman*, we held that a First Amendment challenge to a California's PRA was ripe after concluding that the plaintiff's "fear" that "enforcement proceedings might be initiated" by the State of California was reasonable. *Getman*, 328 F.3d at 1094–95. That conclusion, obviously, was "speculative," insofar as the State had never actually "evinced an intent to prosecute [the plaintiff] for its voter publications." *Id.* at 1093.

Finally, the majority's rigid approach to the ripeness analysis errs by overlooking the well-established principle that in the First Amendment context, courts should apply the "requirements of ripeness . . . less stringently." *Wolfson*, 616 F.3d at 1058; *see also Sullivan v. City of Augusta*, 511 F.3d 16, 31 (1st Cir. 2007) (explaining that "when free speech is at issue, concerns over chilling effect call for a relaxation of ripeness requirements"); *Peachlum v. City of York*, 333 F.3d 429, 434–35 (3d Cir. 2003) (explaining that First Amendment claims are "subject to a relaxed ripeness standard," and that courts have "repeatedly shown solicitude for First Amendment claims because of concern that, even in the absence of a fully concrete dispute, unconstitutional statutes . . . tend to chill protected expression among those who forbear speaking because of the law's very existence"); *U.S. West, Inc. v. Tristani*, 182 F.3d 1202, 1209 (10th Cir. 1999) (explaining that "any chilling effect [a] statute may have on [a party's] First Amendment rights counsels in favor of ripeness").

In sum, I conclude that Appellants' forward-looking claims are ripe. As discussed above, I base this conclusion on our post-*Renne* precedents discussing ripeness in general, such as *Thomas*; our determination in *Getman* that a similar challenge to California's campaign finance disclosure laws was ripe; the Tenth Circuit's decision in *Richardson*, along with its crucial distinguishing of *Renne*; and the general principle that the requirements for ripeness should be relaxed in the context of First Amendment claims.

## IV.

The First Amendment "bars subtle as well as obvious devices by which political association might be stifled."

*NAACP v. Overstreet*, 384 U.S. 118, 122 (1966) (Douglas, J., dissenting from dismissal of writ of certiorari). Regardless of our views on the merits of the controversy, the public marketplace of ideas should not be unnecessarily burdened. This case is justiciable. Therefore, I dissent.[2]

---

[2] At page 6–7 of the majority opinion, a brief history of the litigation over the merits of Proposition 8 is provided. I add here more detail regarding the problems that arose during that litigation.

Before the district court, the Attorney General of California took the position that Proposition 8 was unconstitutional under the federal Constitution, while the other government defendants "refused to take a position on the merits" and "declined to defend Proposition 8." *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 928 (N.D. Cal. 2010). After the district court held that Proposition 8 was unconstitutional under the federal Constitution, California's Attorney General decided not to appeal that decision. *See generally Hollingsworth v. Perry*, 133 S. Ct. 2652, 2659–60 (2013). Subsequently, the California Supreme Court held that California law authorizes the "official proponents" of a voter-approved initiative to "appeal a judgment invalidating the measure when the public officials who ordinarily defend the measure or appeal such a judgment decline to do so." *Perry v. Brown*, 52 Cal. 4th 1116, 1127 (2011). After the Supreme Court granted certiorari, however, it concluded that the official proponents of Proposition 8 lacked Article III standing to appeal the district court's judgment. *Hollingsworth*, 133 S. Ct. at 2668. Accordingly, the Supreme Court vacated the Ninth Circuit's decision which had affirmed the district court. *Id.* at 2660, 2668.

As a consequence of *Hollingsworth*, the only federal court decision remaining that addresses the merits of Proposition 8 is the district court's decision, which by definition is without precedential authority. *See, e.g.*, *Howard v. Wal-Mart Stores, Inc.*, 160 F.3d 358, 359 (7th Cir. 1998). Thus, the *only* precedential appellate decision addressing the merits of Proposition 8 is the California Supreme Court's opinion in *Strauss v. Horton*, 46 Cal. 4th 364 (2009), which held that challenges to Proposition 8 "lack[ed] merit" under California law. *Id.* at 391. In fact, *Strauss*'s holding that Proposition 8 was a lawful amendment to the California Constitution is the final and only appellate decision on the merits of

Proposition 8.  *Id.*

To my knowledge, nothing in California law requires the Attorney General to defend the Constitution of California, and other duly enacted laws of the State of California, from challenges in the courts. Nonetheless, it seems clear that the confusion created by the decisions discussed above, and the resulting abrogation of the federal courts' decisions due to lack of standing, could have been avoided if the Attorney General of California had defended Proposition 8 on appeal in the federal courts.  This suggests that the State of California would do well to consider legislating a process whereby the State's elected officials would be obliged to defend the State's duly enacted laws in court, rather than leaving it to the unfettered discretion of the Attorney General to pick and choose which of the State's laws he or she elects to defend.